## Warren v. Goodloe's Executor et al.

(Decided May 14, 1929.)

ALLEN, BOTTS & DUNCAN for appellant.

E. C. O'REAR for appellees.

OPINION OF THE COURT BY COMMISSIONER HOBSON—
Reversing.

Mrs. Mary E. Goodloe died testate in Lexington, Ky., early in February, 1920, the owner of about $120,000 in personal property and real estate of about the same value. Her will was duly probated, and the Security Trust Company, the executor named therein, qualified and entered upon the execution of the trust. The real estate owned by the testatrix consisted of her home place, known as Loudoun, containing 93.84 acres, which the trust company afterwards sold for $90,000, a tract containing nine-tenths of an acre at the intersection of Maple avenue and the Bryant Station pike, 17.53 acres adjoining the home place, but on the opposite side of the pike from it,

two houses and lots on North Mill street, and some vacant lots in a district known as Peach Orchard. In December, 1921, the trust company sold the 17.53 acre tract to T. L. Warren, and this litigation contesting the sale followed. The circuit court held that the contract could not be enforced. Warren appeals.

The first question made in the case is whether the trust company, under the will, had power to sell the 17.53 acres. The will and codicils, so far as material to this question, are as follows:

"First: I direct my executor hereinafter named to pay my just debts, funeral expenses promptly after this will becomes operative.

"Second: I give, devise and bequeath all of my property and estate of every kind and description, and wheresoever situated, to the Security Trust Company of Lexington, Kentucky, as trustee, and in trust upon the following terms and conditions, to wit:

"(a) Out of my estate said trustee shall set aside and hold such portion as will produce a net income of fifteen hundred ($1,500.00) dollars annually, which income shall be paid quarterly to my daughter, Wilhelmina Goodloe as long as she shall live unmarried.

"(b) There shall also be set aside by said trustee out of my estate such a portion as will produce a net annual income of one hundred dollars ($100.00) which income shall be paid quarterly to Brutus Saunders, my faithful servant, so long as he shall live.

"(c) After setting aside the property to produce these incomes, I direct said trustee to divide and deliver and pay over all the rest of my estate (except my home place known as 'Loudoun') in equal portions among my seven other children or the descendants of any child that may be dead, such descendants to take per stirpes. But if 'Loudoun' shall increase in value by reason of the growth and prosperity of the city of Lexington, and thereby my estate shall produce for each of my seven other children an amount equal to what is set aside to produce the income for Wilhelmina, then after the other seven children are equalized with her allotted estate, she shall participate equally with the other seven children in any excess of my estate over and above what is required to equalize my seven other children

with her trust estate, and the trustee shall then pay, set over and deliver to Wilhelmina also the portion of my estate held in trust for her under the terms of clause (a) hereof. . . .

"(d) As to 'Loudoun' if I should own it at the time of my death, I direct said trustee to hold, manage, sell or convey it in such manner and at such time as in its sound discretion will be for the best interest of my estate. I make this provision to prevent a forced sale of this property by any sort of proceeding and that it may be managed to the best interest of my children. When sold the proceeds shall be divided among my children according to the provisions of clause (c) preceding, but to be settled and divided as soon as it can be done advantageously to all concerned. . . .

"Fourth: In carrying out the trust hereby created I authorize and empower the trustee to sell, convey, invest or reinvest, resell and convey any of the trust estate devised. . . .

"Fifth: I appoint the Security Trust Company of Lexington, Kentucky, executor of this will which is written in my own handwriting. Lexington, Kentucky, April 10, 1913. . . .

"In case my children should wish to change my executor herein named, the Security Trust Company, they can do so provided all can agree upon the same executor. In case of change the substituted executor shall have the same powers as the one herein named. . . .

"June 9, 1916.

"If at the time of my death I still own the house on Mill street, now occupied by Mr. Newton Combs, I want it put in repair, if it needs anything, and set aside, rent free, to be a home for Mina, Louise and a furnished room in it for any of my other children who may want a home at any time. If they ever wish to change the location, they may sell that house, but the money must be invested in another home. When they no longer desire a home, the house may be sold, the money returned to the estate to be divided in accordance with my will already made. . .

"(July 27, 1918).

"After provision in my said will for certain amounts of income to be paid annually as set forth in

clauses (a) and (b), I direct in clause (c) the distribution and division of the rest of my estate except my home place known as 'Loudoun,' I now desire and direct that the executor and trustee named in the will shall have discretion to hold my estate intact until such time as it may think a division thereof, or any part thereof, may be made among the beneficiaries named the will without sacrifice of values; my intention being that if on account of conditions due to the war or other abnormal conditions there should be a marked depression in the value of securities, my executor and trustee shall have the power to defer the distribution and division of my estate until a more propitious time and in the meantime, after paying the income directed to be paid by me in clause (a) and (b) shall divide the remainder of the net income among the persons entitled to receive the estate in the proportions in which they are respectively entitled under the will. But when the division of the estate is made by the executor and trustee, it shall be made in accordance with the directions of my will as modified by the codicil dated July 27, 1918, which forms a part thereof, and I hereby in all respects, except as herein modified, confirm said will and codicil. (October 10, 1918)."

It is clear from the will as a whole that the writer used the words "executor" and "trustee" rather to describe a person than to describe an office, for many of the duties which properly belong to an executor are directed to be performed by the trustee in the will, and vice versa. In the first codicil the children are authorized to change the executor, and it is provided that the substituted executor shall have the same powers as the one named. Under this codicil clearly the substituted executor would discharge all the functions originally committed to the trust company. From the whole will the intention of the testator is plain that the Security Trust Company is to discharge the duties therein specified as long as it remains the executor, and if a change was made the substituted executor should have the same powers as the trust company.

The question then arises, if we substitute the words "the trust company" in the will wherever the words "executor" or "trustee" occur, what does the will say? The sum of its provisions then is this: "I devise and bequeath all of my property to the Security Trust Com-

pany as trustee upon the following trusts: After setting aside out of my estate the property that will produce a net income of $1,500 for my daughter, Wilhelmina Goodloe, and $100 a year to Brutus Saunders, I direct the trustee to divide and pay over all the rest of my estate in equal portions among my seven other children. But if 'Loudoun' should sell for enough so that my other seven children are made equal, Wilhelmina then shall participate with the other seven in any excess over and above what is required to equalize the other seven children with her trust estate. I direct the trust company to hold, sell, or convey 'Loudoun' in such manner and at such time as, in its sound discretion will be for the best interest of my estate, and when sold the proceeds shall be divided as above directed. In carrying out the trust hereby created I authorize and empower the trust company to sell, convey and invest or reinvest any of the trust estate herein devised.''

The first codicil simply authorized the change of the executor by agreement of the children. The second codicil simply related to one of the houses on Mill street, and in this codicil the house referred to ''may be sold, the money returned to the estate to be devided in accordance with my will already made.'' The last codicil was made during the World War, when values were upset and its clear purpose was simply to give the trust company a broad discretion to defer the distribution and division of the estate until values became settled. But this codicil closes with the direction that, when the division of the estate is made by the trust company, it shall be made in accordance with the will.

It cannot be maintained that the power of the trust company to sell the property only applied to Loudoun and the property held in trust for Wilhemina Goodloe and Brutus Saunders. All the property is devised to the trust company, and the trust company is empowered to sell and convey any of the property devised. The second codicil places a limitation upon the sale of the house on Mill street occupied by Newton Combs. The last codicil simply gave the trust company a discretion as to when it should sell Loudoun, or how long it should hold the estate intact. The purpose of the will was the division of the estate among the children as provided in the will. The trust company was given a discretion to determine what property should be divided, or what property should be sold in order best to make this division. This was the

construction of the will, as shown by the proof, not only by the trust company, but by the devisees; for the trust company without objection sold the other house on Mill street, and no question of its authority was made by the devisees, or any of them, then or when they knew that the trust company had cut the property into lots and advertised a sale, when they knew it was trying to sell the 17.53 acres in conjunction with Loudoun. In view of all the facts, it is clear that there was a discretionary power in the trust company to sell such of the estate as was necessary in making a division of the estate.

"A court can best acsertain the true intent and meaning of a testator by putting itself as far as may be in his place, and reading all the directions of his will in the light of his environment at the time it was made. When that intent and meaning can be in this way clearly ascertained, all technical rules and adjudicated cases in other jurisdictions standing in the way of its execution must be disregarded." 2 R. C. L. p. 1253, sec. 100.

"In the interpretation of a will the dominant or primary intention, gathered from the whole threeof and all its provisions, must be allowed to control, and a particular and minor intent is never permitted to frustrate a general and ulterior object of paramount consideration." 28 R. C. L. p. 219, sec. 178.

It is further insisted that the contract with Warren is one that should not be specifically enforced in equity. The facts are these: Shortly after the death of Mrs. Goodloe and the qualification of the trustee, it was the judgment of the trustee that the crest of the prices of real estate had about been reached and that it was desirable to sell the property at an early date. It then employed a civil engineer to divide Loudoun, and the 17.53 acres adjoining, in lots, and when this was done it advertised a public sale of the lots, on March 29, 1920. When the sale came on the devisees were fearful that the front lots might sell for a good price, but that the rear lots might not sell so well, and they objected to the sale, and procured Charles H. Berryman to submit a proposition to buy the whole property for $105,000. The sale was declared off, and then some differences occurred about Berryman's rights under the purchase, and finally, at the instance of the devisees, he withdrew his proposition. Thus things ran along until the summer of 1921, when Warren conceived the idea of buying the 17.53 acres, and

he went to the trust company and offered it $1,000 an acre for this tract. The trust company deemed it unwise to sell the 17 acres without first selling Loudoun, for the purchaser might cut it up into lots and thus prevent a fair sale of Loudoun. So Warren's offer was declined, but the trust company then told 'Warren that it would sell both tracts for $115,000, and if he could find a purchaser for Loudoun it would sell him the 17.53 acres, if the two tracts brought $115,000. He went to work on this proposition, but was unable to get an offer of $115,000 for both tracts. Land prices were going down, and after several conferences, late in the fall, the trust company agreed with Warren that it would sell both tracts for $102,000, he to have $2,000 for his commission, and it would sell to him the 17.53 acres for the balance of $102,000, after taking out the price of Loudoun.

Finally, in December, Warren sold Loudoun to Judge Bailey of Paintsville for $90,000, and submitted to the trust company his bid for the 17.53-acre tract, so as to make the two tracts produce $102,000. The trust company then called the devisees together, and after some discussion and a slight change in the written contract, the devisees approved the sale, and the trust company thereupon entered into a written contract with Judge Bailey and 'Warren to convey to them the property respectively, according to the terms of the contract. But before a conveyance was made the devisees learned that Judge Bailey had agreed to pay $90,000 for Loudoun, and that Warren was getting the 17.53 acres for $12,000. Thereupon they objected to the sale, and the trust company, to take no risk, filed this suit under the Declaratory Judgment Act, asking the court to adjudge the rights of the parties. Warren filed his cross-petition, praying that his contract be enforced.

There is no dispute in the evidence as to the contract between the trust company and 'Warren. It had been unable for more than a year to find a purchaser for the property, which was unproductive of much income, and was expensive to keep up. It was properly unwilling to sell the 17.53 acres adjoining to be cut up in town lots, as this might materially affect the subsequent sale of Loudoun. Real estate values were declining, and it was not a bad policy to interest Warren in the sale of Loudoun, as he wanted to buy the smaller tract. The parties acted in good faith in making the contract, and it is ap-

parent from the record that, if Warren had found a purchaser for Loudoun at only $85,000, no dispute about this matter would ever have arisen. What has given rise to the dispute is that Warren sold Loudoun at such a price that he got the smaller tract for only $12,000. But he got this by reason of the fact that by his exertions he sold Loudoun for a good price. The trust company very properly maintained that it had made a fair contract with Warren and that it was not at liberty to go back on its contract because Warren had made a profit out of it.

Warren did not undertake the negotiations as a mere real estate broker. He was not an agent in the ordinary sense of the word. He was expressly given an interest, and that interest was served by his procuring as much as possible for Loudoun. His contract would not be satisfied by the payment of a commission only, when he was to have a small commission, and also the right to buy the smaller tract of land. No limitation, express or implied, was imposed upon Warren as to the price of either tract. He was commissioned to obtain a gross sum for the two, and its apportionment was a matter of judgment, about which men might reasonably differ, but wholly immaterial to the devisees, so long as they got a gross sum of $102,000, which they were willing to accept. Being immaterial, the fact that Warren did not disclose how the price was to be apportioned afforded no ground for resisting specific performance of his contract. The trust company understood this matter, and so did the devisees. The trust company kept faith. No duty was imposed upon it to take advantage of Warren's work, except upon the express terms under which it was undertaken and performed. In negotiating a high price for Loudoun, Warren was working for his own interest, and not for his principal, except indirectly by enabling him to get the gross price demanded for the two properties.

The argument for the appellants is chiefly rested on the ground that the devisees are not estopped by their consent to the sale, because they did not know all the facts at the time they so consented, and that they did object as soon as they learned that Warren was getting the smaller tract for $12,000. But their consent to the sale was unnecessary. The rights of the parties turn on the contract between Warren and the trust company. If the trust company had power to make the sale, and did make the contract fairly and knowingly, the estate is

bound by it. It is absolutely clear from all the proof that every fact was known to the trust company all the time, and that Warren in no way imposed upon it. The trust company acted intelligently and with full knowledge of all the facts. It was not required to go back on its deliberate contract with Warren, though the contract was not in writing. It did put the contract in writing before any objection was made, and when, as it supposed, all parties were satisfied. The law does not require of a trustee the violation of his plighted word to one who trusted in his integrity or other conduct that an honest man would be ashamed of. The contract was therefore binding upon the trust company, and it had no reason to refuse to carry out its contract deliberately made.

"The provision that no action shall be brought on a contract within the statute does not render the contract entirely void but merely unenforceable. It is valid for all general purposes, except sustaining an action at law for its breach or a suit in equity for its specific performance when the defense of the statute is properly taken." "For the reason that the contract is to be deemed unenforceable merely the party to be charged thereon may waive the defense of the statute and thereby render the contract unenforceable." 25 R. C. L. pp. 691, 692.

The estate is bound by the contract, and the court must enforce the contract fairly made. The rule as to specific performance is thus well stated:

"A decree for the specific performance of a contract is not a matter of right, but rests in the sound discretion of the court. This discretion is not arbitrary or capricious but judicial, and is controlled by the established doctrines and settled principles of equity. The desired relief will be granted or withheld by the court upon a consideration of all the circumstances of each particular case, and no positive rule can be laid down by which the action of the court can be determined in all cases. If, however, all the necessary incidents and conditions are proven by satisfactory evidence, the relief should be decreed as a matter of right, and not as a mere favor. Broadly speaking, whenever a contract is in writing, is certain in its terms, is for a valuable consideration, is fair and just in all its provisions, and is capable of being enforced without hardship to either party, it

is as much a matter of course for a court of equity to decree its specific performance as for a court of law to award damages for its breach." 25 R. C. L. p. 214, sec. 16.

It is insisted that Warren was indebted to the trust company, and that the trust company so betrayed its trust in the contract with him. But 'Warren was good for his debt; not only so, he wanted to buy the 17.53 acres. His debt to the trust company did not enter into the contract. It was brought about by the fact that the trust company would not sell the smaller tract before the larger tract was sold. The purpose of the contract was to get a sale of the larger tract.

It is also insisted that Warren had worked for the trust company, but this was five or six years before, and to say here that the contract should for these reasons not be enforced would be simply to refuse relief on suspicion that something was wrong, without any proof of it. This the court cannot do.

Judgment reversed, and cause remanded, for a judgment in favor of Warren as above indicated.

Whole court sitting, except Judge CLAY.

### DISSENTING OPINION BY JUDGE DIETZMAN.

In so far as the majority opinion holds that the Security Trust Company had the power under the will of Mrs. Mary E. Goodloe to sell the 17.53-acre tract, which, for convenience, I shall hereafter refer to as the 17-acre tract, I concur, but in so far as that opinion holds that the appellant, T. L. Warren, was entitled to specific performance of the contract set up in his intervening petition, I must dissent. In order that the basis of my dissent may be fully understood I must make a somewhat fuller statement of the facts than appears in the majority opinion, and in the elaboration of the facts I shall use only the testimony of the appellant, Warren, and that of Mr. Manning, president of the Security Trust Company.

The evidence shows that about three or four months prior to December 24, 1921, the date of the contract of which the appellant Warren seeks specific performance, he became very anxious to purchase this 17-acre tract. As he says, he first dickered wtih the Goodloes for this property and offered one of them $12,000 for the place. They told him to see Mr. Manning, which he did, and after some parleys with the latter, he offered Mr. Manning

$1,000 an acre for the place which would make the purchase price come to $17,530. I wish to emphasize that this offer was made within three or four months prior to the date of the contract herein sought to be enforced and the reason I do so is that I gather from the majority opinion that my brethren conclude that the record shows that there was a rapid fall in values in the realty market of Lexington between the time of these offers on the part of Warren and the date of the contract. As I read that record, there was no such tobogganing of prices in these four months as decreased the value of these 17 acres from the bid price of $17,530 in the fall to the $12,000 provided for its sale in the contract of December 24th. On the contrary, Mr. Manning himself on page 174 of the record practically admits that at the time of the contract in December the property was worth $1,000 an acre. I find at that place in the record that when asked why did he suggest the placing of the value of $15,000 to $17,000 for the 17-acre tract, Mr. Manning answered: ''That was simply my estimate of the relative value.'' He used the word ''relative,'' because he was also referring to the Loudoun tract. He was then asked:

''Then the 17 acres was sold to Warren for too small a price? A. He got it at a considerably reduced price.

''Q. By at least $5,000? A. I could not state that.

''Q. That is the difference between $12,000 and $17,000, isn't it? A. Yes.

''Q. Didn't you suggest that $17,000 was a fair price? A. I estimated that it was. I had no information whatever in regard to it.

''Q. But you do go on record now as saying that the sale of the 17 acres at $12,000 was too small a price? A. I think it was a bargain.''

And further on he said:

''The result is that the estate got $102,000, less $2,000, for those two tracts of land. The division of the consideration is in my judgment *unequal*. *I think the smaller tract of land is worth really more than it brought and the larger tract is worth really less than it brought*.'' (Italics mine.)

Referring back now to the negotiations begun by Warren looking towards the purchase of the 17-acre

tract, when he made his offer of $1,000 per acre for this tract to Manning, I find that the latter told him in substance that they, the heirs and the trust company, did not wish to sell the 17-acre tract without also selling Loudoun, and he asked Warren to buy the Loudoun tract, too. Warren replied that he could not do so, because the proposition was too big for him. Warren then testifies:

"He then told me to find a purchaser for the larger tract of land and that he would then sell me the smaller one. I told him I had not thought of that, but would see if it could be done. . . . I talked price with Mr. Manning for the whole proposition, and at that time he said, if I could get $115,000 for the whole property, he would recommend its acceptance, and I endeavored to do this, but did not succeed. We finally got to the point where Mr. Manning said, if we could get $102,000 for the property, *he would recommend the sale of it,* and would agree to pay me $2,000 for making the sale." (Italics mine.)

I pause here to state that the evidence amply justifies my statement that the reason the price of $102,000 was settled upon was that Mr. Warren and Mr. Manning did not think that Loudoun would bring over $85,000; that they thought it was worth somewhere between $80,-000 and $85,000; and that neither one of them at the time thought that Loudoun would bring the $90,000 which it did. It will be noted that Mr. Warren was thus employed as an agent at least to sell the Loudoun place. There was no contract made at the time between him and Mr. Manning that the trust company would sell the two places for $102,000. It is perfectly clear that all Mr. Manning said was that he would recommend such a sale to the heirs. With the matter in this shape, Mr. Warren interested Judge Bailey in buying Loudoun, and, as he says on page 71 of the record, he also tried to interest Judge Bailey in buying the 17-acre tract but could not do so.

This shows to my mind that Mr. Warren understood that he was in the position of agent of the trust company, with the privilege, if he so desired, of buying the 17-acre tract as principal. Warren knew that the trust company did not dream that Loudoun would bring more than $85,-000. Although Warren may in the best of faith have thought otherwise, in my judgment it was his legal duty as an agent, when he secured an offer of $90,000 for Lou-

doun, to disclose this to the trust company. However, he did not do so, but reported to the trust company that he had a proposition to buy the two tracts for $102,000. The trust company, although it may have had the right under the will to sell the places without the concurrence of the heirs, did not undertake to do so, but *did exactly what it told Warren it would do;* that is, it recommended the sale to the heirs. This is the best that Warren at that time had a right to expect. Manning had not agreed to sell the two places for $102,000, but only to recommend such a sale to the heirs, and Warren had acted only upon that promise. The trust company then, in ignorance that Warren had an offer of $90,000 for Loudoun, did recommend to the heirs the sale of the two tracts at $102,000. These heirs, in ignorance of the fact that Loudoun was bringing at least $5,000 more than any one had ever thought it would bring, did agree to make the proposed sale. This agreement, however, did not constitute any contract of sale. *Before any contract* was entered into by the trust company and Warren, and/or Bailey, as I read the record (Record, p. 172 et seq.), Mr. Warren disclosed to the trust company the fact that he had an offer from Judge Bailey to buy Loudoun for $90,000. If no contract had been entered into, there was no plighted word to be broken. The trust company ought not to have supposed that all the parties were satisfied when it knew the consent of the heirs had been given in ignorance that Loudoun was bringing any such price as $90,000. When this information about the price to be given for Loudoun was imparted to the trust company, what was then its duty? It at once suggests itself to my mind that the trust company should have reported this to the heirs, since their consent to the sale had been given, through no fault of the trust company, in ignorance of what the situation really was. This was not done. Probably in law this makes no difference, since the trust company did have the right to make the sale, whether the heirs consented or not.

But, if we are relegated to the strict legal rights and duties of the parties, then let us see what, in my judgment, they were. At this time the trust company was under no legal duty to execute the contract herein sought to be enforced. Nor do I think it was under a moral duty, since it was understood all around that the trust company would not make the sale, unless the heirs concurred and their concurrence had been given when they

did not know all the facts. Before a moral duty could fasten upon the trust company, the concurrence of the heirs would have to be given with full knowledge of all the facts on their part. The trust company had an offer for $90,000 for the Loudoun tract which it could and did accept. Under elementary law it was the legal duty of the trust company as trustee to do for the beneficiaries the very best it could in the exercise of ordinary care. 26 R. C. L. 1280 et seq. To execute the contract herein sued on would be to let Warren get a piece of property worth $17,530 for $12,000. The trust company was under no legal obligation to do this. At the best, Warren according to his own testimony was entitled for his services in the sale of Loudoun to the usual commission charged by real estate agents of 3 per cent., which would be $2,700, instead of the $2,000 verbally agreed to be paid him. In my judgment, under the law regulating the duties of trustees to their cestuis, it was the duty of the trust company to accept Judge Bailey's offer for the Loudoun tract, perhaps to pay Warren a full real estate commission for selling the Loudoun tract, and to reject his offer to buy the 17-acre tract for the $12,000.

Under the familiar rule governing specific performance, which requires it to be refused where inequitable, specific performance here should have been refused. Warren knew all the facts at the time he executed the contract. So did the trust company. Warren at the very least was charged with notice of the trustee's duties under the law. He could not in equity insist on any contract that would impinge upon those duties. And yet that is what he is asking in this suit. His good faith cannot prevail against the legal obligations of the trustee. That the trust company was not certain that it had proceeded upon the correct course is manifested by this suit, which puts the responsibility of validating this transaction upon the court. The trust company is to be commended for refusing to go further without an order of court. That order, under the facts as I understand them, should never be given. In my judgment, the lower court correctly refused to adjudge the specific performance prayed, and its judgment should be affirmed.

I am authorized to state that Judge LOGAN concurs in these views and this dissent.